Filed 11/24/20  Yassa v. Medical Board of California CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| NADINE YASSA,<br><br>　　　　Plaintiff and Appellant,<br><br>　　v.<br><br>MEDICAL BOARD OF CALIFORNIA,<br><br>　　　　Defendant and Respondent. | C090059<br><br>(Super. Ct. No. 34-2018-80002874-CU-WM-GDS) |

　　　　In this proceeding, plaintiff Nadine Yassa, M.D. (Yassa), challenges the decision of defendant Medical Board of California (the Board) to discipline her physician and surgeon's certificate.  After the hearings, the Board found Yassa guilty of multiple acts of gross negligence, repeated negligent acts, excessive treatment, and failure to maintain adequate and accurate records, in connection with her care and treatment of four patients.  The Board revoked her license, stayed the revocation, and placed her on five years' probation.  Thereafter, Yassa petitioned the superior court for a peremptory writ of

1

mandate to set aside the Board's decision. After exercising its independent judgment on the evidence, the trial court denied the petition. Yassa now appeals from the judgment denying her petition, challenging the sufficiency of the evidence for numerous findings supporting the decision.

Construing her improper appeal from the judgment as a petition for writ of mandate, we find the evidence in the record insufficient to support some of the challenged findings. In all other respects, we deny her petition. We shall issue a writ directing the superior court to vacate its judgment denying the petition and enter a new judgment partly granting her petition for a peremptory writ of mandate.

PROCEDURAL BACKGROUND

Yassa is a physician licensed by the Board, holding certificate No. A48720. She graduated from medical school in 1980 and received her license to practice medicine in California in 1990. She is board certified in sleep medicine and neurology, with a special qualification in child neurology. Since 1995, Yassa has been engaged in the private practice of medicine. Her practice treats adults and children with neurological conditions, including autism, seizure disorders, epilepsy, headaches, multiple sclerosis (MS), stroke, and Parkinson's disease. Approximately 30 to 40 percent of her patients are children. Before the proceedings leading to this appeal, Yassa had no record of discipline with the Board.

After receiving complaints from patients in 2013 and 2014, Anna Vanderveen (Vanderveen), an investigator with the Board, commenced an investigation related to Yassa's care and treatment of four patients: V.A., B.A., R.C., and D.K. As part of her investigation, Vanderveen reviewed patient records and interviewed Yassa. When the investigation was complete, Vanderveen issued investigative reports, which were then reviewed by an expert, Jack Florin, M.D. (Florin). Florin opined that Yassa's care and treatment of all four patients departed from the standard of care.

2

In October 2015, the Board filed an accusation against Yassa, and in July 2016, an amended accusation (as amended, the Accusation). The Accusation alleged that Yassa was subject to discipline for gross negligence, repeated negligent acts, excessive treatment, failure to maintain adequate and accurate records, and failure to comply with a request for records in connection with her care and treatment of two minors, V.A. and B.A., and two adults, R.C. and D.K.

On December 12, 13, and 16, 2016, and August 9, 10, and 11, 2017, an administrative law judge (ALJ) conducted a hearing on the Accusation. At the hearing, Florin testified as a medical expert on behalf of the complainant. R.C., D.K., V.A.'s mother, and Vanderveen also testified for the complainant. Peter Cassini, M.D. (Cassini), testified as an expert for Yassa. Yassa also testified in her own defense.

On November 27, 2017, the ALJ rendered her proposed decision. The proposed decision found that the opinions rendered by Florin were "in all instances more persuasive" than those of Cassini, for several reasons, including that Florin had "extensive knowledge in the treatment of adults and children with neurological conditions" such as MS and epilepsy. Cassini, in contrast, did not have specialized experience in diagnosing or treating MS, did not treat children with epilepsy, did not understand the difference between an extreme and ordinary departure from the standard of care,[1] and based some of his opinions on representations by Yassa, which, he acknowledged, were in some instances inconsistent with her medical records.

---

[1] Improper medical treatment constitutes "gross negligence" when the treatment demonstrates "an extreme departure from the standard of medical care, which [is] the equivalent of 'want of even scant care . . . .' " (*Gore v. Board of Medical Quality Assurance* (1980) 110 Cal.App.3d 184, 196, 198.)

3

The decision concluded that Yassa committed gross negligence (Bus. & Prof. Code, § 2234, subd. (b))[2] and repeated negligent acts (§ 2234, subd. (c)) in her care and treatment of patients V.A., B.A., and R.C.; repeated negligent acts in her care and treatment of patient D.K.; ordered excessive diagnostic procedures (§ 725) for patients V.A., B.A. and R.C.; and failed to maintain adequate and accurate medical records (§§ 2266, 2234) with respect to all four patients. The decision also concluded Yassa is subject to civil penalties (§ 2225.5, subd. (a)(1)) for failing to provide a certified copy of D.K.'s medical records to the Board within 15 days of receiving the request. The decision revoked Yassa's license, stayed the revocation, and placed Yassa on five years' probation. The decision also assessed a civil penalty of $10,000. The Board subsequently adopted the ALJ's proposed decision as its decision (the Decision), which became effective on February 26, 2018.

On April 26, 2018, Yassa filed her petition for writ of administrative mandate challenging the Board's decision. Exercising its independent judgment on the evidence, the trial court found no abuse of discretion and denied the petition. Notice of entry of judgment was filed and served on April 18, 2019. On June 13, 2019, Yassa noticed an appeal from the judgment.

DISCUSSION

I

*Appealability*

Yassa appeals from the judgment denying her petition for writ of mandate. Citing section 2337, the Board contends that we lack jurisdiction and should dismiss the appeal. In her reply, Yassa concedes her appeal is improper, but urges us to treat her appeal as a petition for extraordinary writ. (See *Zabetian v. Medical Board* (2000) 80 Cal.App.4th 462, 466 [appellate court may treat improper appeal as writ petition "when review by writ

---

[2]     Undesignated statutory references are to the Business and Professions Code.

4

is the statutorily prescribed mode of review"].)  We will exercise our discretion to treat the appeal as a petition for an extraordinary writ.

II

*Standard of Review*

After a trial court exercises its independent judgment to determine whether an agency's findings are supported by the weight of the evidence, an appellate court is limited to determining whether the trial court's findings are supported by substantial evidence.[3]  (*Watson v. Superior Court* (2009) 176 Cal.App.4th 1407, 1412.)  In making that determination, we do not reweigh the evidence, but instead indulge all presumptions and resolve all conflicts in favor of the decision.  (*Arthur v. Department of Motor Vehicles* (2010) 184 Cal.App.4th 1199, 1205; *Rivard v. Board of Pension Commissioners* (1985) 164 Cal.App.3d 405, 412-413.)  When two or more inferences reasonably can be deduced from the facts, the appellate court is without power to substitute its deductions for those of the trial court.  (*Shea v. Board of Medical Examiners* (1978) 81 Cal.App.3d 564, 578; see also *Shelden v. Marin County Employees' Retirement Assn.* (2010) 189 Cal.App.4th 458, 464 [if a finding is supported by substantial evidence, it is irrelevant that the record also contains evidence that would have supported a different finding].)

---

[3]  Before the hearing on her writ petition, Yassa filed a request for a statement of decision asking the trial court to decide, among other things, whether the Board's findings were supported by the evidence.  The trial court, exercising its independent judgment on the evidence, found no abuse of discretion.  Although the court did not make its own findings of fact, the doctrine of implied findings requires us to presume that the trial court made all factual findings necessary to support its judgment.  (*Espinoza v. Shiomoto* (2017) 10 Cal.App.5th 85, 100; see also *In re Marriage of Cohn* (1998) 65 Cal.App.4th 923, 928 [party must state objection to statement of decision to avoid implied finding on appeal].)

We start with the presumption that the record contains substantial evidence to support every finding. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.) It is the appellant's burden to demonstrate otherwise. (*Ibid.*)

III

*Patient V.A.*

The Decision found that Yassa was grossly negligent in her care and treatment of patient V.A. because Yassa (1) diagnosed and treated V.A. for epilepsy despite no medical basis to support that diagnosis; (2) documented "breakthrough seizures" despite no medical evidence to support such a finding; and (3) ordered excessive diagnostic tests without medical indication. Yassa contends there is insufficient evidence to support these findings. We disagree.

A.    *Additional background*

Patient V.A. was an approximately eight-year-old girl referred for headaches. Yassa met with V.A. and her mother a total of nine times from September 2009 to March 2011.

At the initial appointment on September 10, 2009, Yassa documented that V.A. had suffered daily, persistent headaches for about two months following a viral infection in July 2009. The headaches were described as causing "tension and pressure on the head," with nausea, photophobia, and episodes of difficulty in concentration. V.A. denied vomiting, numbness, tingling, weakness, visual symptoms, speech problems, or sudden onset confusion. V.A. described the pain from the headaches as a three or four out of 10.

After examination, Yassa assessed V.A. with childhood migraines. Yassa prescribed amitriptyline to treat the migraines. She ordered magnetic resonance imaging (MRI) to rule out any structural lesions, and a video electroencephalogram (EEG) to rule out seizures. The order for the EEG was not documented in the patient's records.

6

When V.A. returned for a followup visit on September 30, 2009, Yassa noted that the MRI revealed an arachnoid cyst in the posterior fossa of the brain. She also noted that the EEG result was "abnormal" and "highly suggestive" of a generalized seizure disorder. Yassa explained to V.A.'s mother that her daughter appeared to be having "petite" seizures. Yassa documented her assessment as "generalized epilepsy, rule out." Due to "seizures on EEG," she discontinued the prescription for amitriptyline, and prescribed Depakote,[4] 500 milligrams per day.

At the next appointment, V.A. denied having any seizures or "auras" (precursors to seizures). But Yassa changed her assessment of V.A. from "generalized epilepsy, rule out" to "generalized epilepsy" and "seizures, break through." Yassa ordered a repeat video EEG "to rule out any epileptogenic foci."

The repeat EEG was completed on November 25, 2009. The EEG technician identified no abnormalities, but Yassa again interpreted the EEG results as "abnormal" and "highly suggestive of generalized epilepsy."

At V.A.'s next appointment, December 7, 2009, Yassa documented that V.A. had a "staring spell" during Yassa's examination of her. V.A.'s mother, who was present during the entire examination, denied the staring spell occurred. Yassa increased V.A.'s prescription for Depakote to 750 milligrams per day. Yassa testified that she increased the Depakote to treat V.A.'s headaches. However, in her Board interview, Yassa explained that the Depakote was prescribed both to "improve [V.A.'s] headaches" and to "suppress the epileptiform activity on the EEG."

In February 2010, V.A. complained of learning difficulties, but continued to deny any seizures or auras. Yassa noted that V.A. met with a consulting neurosurgeon, who reviewed the previous MRI and concluded V.A. did not have an arachnoid cyst, but

---

[4]     Depakote is a prescription medicine commonly used to treat epilepsy or migraines.

rather, a normal variant known as a mega cisterna magna. Nevertheless, Yassa did not change her assessments of "generalized epilepsy" and "arachnoid cyst." Yassa increased V.A.'s prescription of Depakote to 1,000 milligrams per day, the "normal dose" for treating epilepsy or seizures.

In May 2010, after V.A. reported adverse side effects secondary to Depakote, Yassa discontinued that medication and instead prescribed Keppra, an antiepileptic medicine. Yassa ordered another (third) video EEG to "rule out seizures," and a brainstem auditory evoked response (BAER) test to "rule out hearing loss." In July 2010, Yassa ordered a multiday ambulatory EEG. The results of the video EEG were normal. V.A. never completed the BAER test or the ambulatory EEG.

At an appointment in January 2011, V.A. again complained of learning difficulties and denied any seizures or auras. Yassa reordered an ambulatory EEG. She also prescribed Strattera. Yassa testified that she prescribed Strattera to rule out attention deficit disorder. But Yassa's medical records indicate the Strattera was prescribed for "[g]eneralized epilepsy." In any event, V.A.'s mother refused the prescription.

Yassa's last appointment with V.A. was on March 14, 2011. During that visit, Yassa noted that the results of the ambulatory EEG were normal. V.A.'s mother reported that V.A. was still struggling in school and was using over-the-counter medication for her headaches. V.A.'s mother said she wanted V.A. taken off medication, so Yassa discontinued the Keppra. Yassa's final assessment was "arachnoid cyst," "generalized epilepsy," "learning disability," and "adverse effect of med[icine] correctly given."

After leaving Yassa's care, V.A. saw a different neurologist. The new neurologist reviewed the treatment records and concluded that V.A. never had seizures and that no additional EEG's were necessary. Still concerned by what Yassa had told her, V.A.'s mother sought a second opinion from another neurologist, who ordered an EEG and confirmed that V.A. did not have seizures.

8

B.    *Epilepsy diagnosis*

The Decision found that Yassa committed gross negligence by diagnosing and treating V.A. for epilepsy despite having no medical basis to support that diagnosis. The Decision rejected Yassa's claim that she never diagnosed V.A. with epilepsy despite repeatedly listing it as an "assessment" in her medical records.

On appeal, rather than challenge whether she diagnosed V.A. with epilepsy, Yassa challenges the finding that there was no basis for the diagnosis. She argues that the finding is based on a false factual premise: that she diagnosed V.A. with epilepsy based solely upon the results of the initial EEG.

However, at her Board interview, Yassa admitted that she diagnosed V.A. with a "generalized seizure disorder" based on the initial EEG results. Yassa explained that she prescribed the Depakote, in part, to suppress the epileptiform activity on the EEG. V.A.'s mother testified that Yassa told her she prescribed Depakote to treat the "petite" seizures identified on the EEG.

In addition, Yassa's medical records support the finding that she diagnosed V.A. with epilepsy based on the EEG results. At V.A.'s second office visit, Yassa interpreted the results of the initial EEG to be abnormal, which she construed to be "highly suggestive of generalized epilepsy." Despite that V.A. presented only with complaints of headaches and had no history of seizures, Yassa documented her assessment as "generalized epilepsy, rule out." Yassa then discontinued the medication she previously prescribed for V.A.'s headaches and prescribed Depakote due to "seizures on EEG." By the end of V.A.'s next appointment, and without any documented change in V.A.'s symptoms, Yassa changed her assessment from "rule out" epilepsy to "generalized epilepsy."

Yassa contends that in addition to the initial EEG, she also relied on "abnormalities" in the second EEG, the MRI finding of an arachnoid cyst, and V.A.'s "staring spell" at the December 7 visit. But the Decision credited the testimony of V.A.'s

9

mother that the reported staring spell never occurred, and found "not credible" Yassa's explanation that only a " 'trained eye' " could see it.  Our task on appeal is not to reweigh the evidence, but merely to determine whether the findings are supported by substantial evidence.  (*Roy v. Superior Court* (2011) 198 Cal.App.4th 1337, 1346, 1348.)  Here, the mother's testimony is substantial evidence to support the finding that the staring spell did not occur.

Yassa's reliance on the MRI is similarly misplaced.  First, as the Decision acknowledges, the results of the MRI were, at best, inconclusive as to whether V.A. had an arachnoid cyst.  Second, Florin provided expert testimony that an arachnoid cyst in the posterior fossa area of the brain would not cause seizures.  Third, there was no evidence presented that an arachnoid cyst is relevant to a diagnosis of epilepsy.

With respect to the second "abnormal" EEG, Florin testified that he reviewed the results of that EEG and found no abnormalities.  Further, even if there were abnormalities, Florin testified that epilepsy cannot be diagnosed based solely on abnormal EEG results.  Because V.A. complained only of headaches and had no symptoms of epilepsy or seizures other than the alleged "abnormal" EEG's, Florin opined that there was no medical basis for Yassa's diagnosis.  Florin's opinion is substantial evidence to support the finding that Yassa diagnosed epilepsy without a medical basis.

C.      *Breakthrough seizures*

The Decision found gross negligence in Yassa's documentation of "breakthrough seizures," despite no medical evidence of seizures.  Yassa argues the record evidence is insufficient to support that finding.  We disagree.  As discussed above, Yassa's medical records, the testimony of V.A.'s mother, and Florin's expert testimony is substantial evidence to support the finding.  Yassa's claim at the hearing that she documented breakthrough seizures merely as a flag or "alert" to ensure she did not miss a breakthrough seizure was found not credible.  Yassa has failed to show this was an abuse

10

of discretion. We conclude there is substantial evidence to support the finding of gross negligence based on Yassa's documentation of breakthrough seizures.

D. *Excessive diagnostic testing*

Yassa also challenges the Decision's finding that she committed gross negligence by ordering excessive tests (multiple EEG's and a BAER) with no medical indication. We conclude there is substantial evidence in the record to support the finding based on Florin's testimony that EEG's were not indicated for complaints of tension headaches, and the testimony establishing that a BAER test was not indicated as a routine test to rule out hearing loss.

E. *History of learning disabilities*

Yassa also challenges the finding that V.A. had a history of learning disabilities predating the onset of headaches. However, because Yassa has failed to show how this finding was necessary to the outcome of the Decision, we find it unnecessary to decide whether it was supported by substantial evidence.

IV

*Patient B.A.*

The Decision found that Yassa was grossly negligent in her care and treatment of patient B.A. because she (1) ordered multiple repeat EEG's and a BAER test without medical indication; (2) lacked knowledge of or failed to consider the interactions between Depakote and Lamictal; (3) prescribed Prozac to a patient with a history of suicidal thoughts; and (4) improperly diagnosed circadian sleep disorder. Yassa contends there is insufficient evidence to support these findings. We agree that there is not substantial evidence to support finding gross negligence based on Yassa's ordering of the BAER test, prescribing Prozac, or diagnosing circadian sleep disorder, but we conclude there is substantial evidence to support the other findings.

11

A.    *Additional background*

Patient B.A. was a 14-year-old girl with a four-year history of seizures.  B.A. established care with Yassa in August 2009, after relocating from Florida.  In Florida, B.A. was treated by a neurologist who diagnosed her with juvenile myoclonic epilepsy.

At her initial appointment on August 10, 2009, B.A. presented to Yassa with complaints of epileptic seizures and twitches, as well as other symptoms, including fatigue, dizzy spells, difficulty sleeping, difficulty concentrating, depression, and anxiety.[5]  The seizures/twitches reportedly were improved with medication (Depakote and Klonopin).  Yassa noted that B.A. reportedly "[t]rips a lot," and had a history of suicidal thoughts.

Yassa reviewed B.A.'s medical history from Florida.  Among other things, the records show that a sleep study performed in 2007 found no evidence of an abnormal sleep disorder, but recommended further testing and evaluation for B.A.'s insomnia.

Yassa's initial assessment of B.A. included "juvenile myoclonic epilepsy," and "insomnia unspecified."[6]  Yassa prescribed Depakote/Depakene (1,500 milligrams per day), Klonopin, and Vistaril.  Yassa ordered laboratory tests to check Depakote levels,[7] a video EEG, and a BAER test to "rule out any brain stem lesions versus vestibular lesions."  The results of the EEG and BAER tests were normal.

---

[5]    Yassa documented three to 13 prior seizures, but B.A.'s mother only described two prior seizures in the medical history questionnaire.

[6]    At subsequent appointments, Yassa changed the assessment to "circadian cycle problems, insomnia."  Her final assessment of B.A. did not include circadian cycle problems or insomnia.

[7]    Depakote levels refer to the amount of valproic acid in the blood.  The therapeutic range is from 50 to 100.

At a followup visit about three weeks later, Yassa adjusted B.A.'s medication, discontinuing the Klonopin and Vistaril and prescribing Topamax tablets plus a Topamax "sprinkle."

At the next appointment, in November 2009, Yassa noted the Depakote dosage was "high," and the patient asked to decrease it. Yassa reduced the Depakote to 1,000 milligrams per day and discontinued the Topamax sprinkle. Yassa ordered laboratory tests to check Depakote levels, and another video EEG to "rule out any epileptogenic foci" after the adjustment in B.A.'s medicine. The EEG was normal.

In May 2010, because B.A. complained of "memory problems," Yassa discontinued the Topamax tablets. Yassa testified that due to the change in medications and because B.A. would soon be old enough to drive, she ordered two more EEG's: a third video EEG and a multiday ambulatory EEG. The results of both EEG's were normal.

On August 11, 2010, B.A. had to be taken to the emergency room after suffering back-to-back seizures. At her next appointment with Yassa in late August, B.A. complained that she had been experiencing "a lot of twitching" since the seizures. Yassa testified that she did not increase the prescription for Depakote because B.A. was approaching childbearing age and Depakote is known to cause birth defects. Yassa instead prescribed Lamictal.[8] In connection with the change in medication, Yassa ordered another EEG, the results of which were normal. She did not order any laboratory tests.

---

[8] Lamictal has known safety risks, especially when combined with certain other medications, including Depakote (valproate). When Lamictal is prescribed, the standard of care requires that the dosing be started at a low level and then gradually increased over time to the target through a process known as "titration." There is no indication in the record of the August 23 visit that Yassa introduced the Lamictal through titration. But Yassa testified that she did, and other records support her testimony.

13

At a followup visit on August 30, 2010, B.A. indicated that after starting "the first dose of Lamictal 25 mg.," she was confused, had twitches and was unusually nervous. Yassa advised her to keep taking the Lamictal.

Yassa saw B.A. for the last time on November 4, 2010. B.A. reported she was unable to sleep at night, missing a lot of school, and having trouble with coordination, balance, and had memory issues. Yassa prescribed Prozac for depression. Although there is no indication in the record that Yassa discussed the risks of Prozac with the patient and her mother, Yassa testified that it would have been her custom and practice to do so.

A subsequent treating neurologist diagnosed B.A. with "intractable" (i.e., hard to control) medically refractory epilepsy and prescribed Depakote and Topamax to control her seizures.

B.    *Indication for repeat EEG's*

Yassa challenges the sufficiency of the evidence to support the finding that she was grossly negligent in ordering repeat EEG's without medical indication.[9] Yassa argues the finding of cause for discipline is based on a misunderstanding of the facts. In particular, she argues that because the results of the initial EEG were normal, she reasonably questioned the diagnosis of juvenile myoclonic epilepsy and ordered additional EEG's to confirm (or refute) such diagnosis. We are not persuaded.

Yassa has not cited any evidence to support her claim that she questioned the juvenile myoclonic epilepsy diagnosis, and there is overwhelming evidence to the contrary. Yassa documented her assessment of juvenile myoclonic epilepsy at B.A.'s

---

[9]    Although the Decision discusses five EEG's (four video EEG's and one ambulatory EEG), and finds cause for discipline based on all of them except the initial video EEG, Yassa limits her argument to the second and third video EEG's and the ambulatory EEG.

initial office visit and subsequently repeated that assessment at every visit thereafter. During her investigative interview, Yassa was questioned about the diagnosis, and she agreed that the diagnosis of juvenile myoclonic epilepsy was reasonable. Further, when Yassa was asked why she ordered repeat EEG's after the first EEG was normal, Yassa told investigators that EEG's in people with juvenile myoclonic epilepsy are oftentimes "normal," contradicting her argument here that a diagnosis of juvenile myoclonic epilepsy should reflect abnormalities on an EEG.

Yassa also argues that undisputed evidence shows it was within the standard of care for her to order repeat EEG's to assess the effects of changes in B.A.'s medication. Yassa is incorrect; the evidence was disputed. Although Yassa and her expert opined that EEG testing was appropriate after a change in medication, Florin disagreed. Florin testified that when B.A. first presented, she had a "clear diagnosis of juvenile myoclonic epilepsy." Florin testified that because B.A. had a clear diagnosis of epilepsy, was generally stable, and already had one normal EEG, there was no reason for Yassa to order four additional EEG's (including two at the same time) to rule out epileptogenic foci.

It also is noteworthy that when Yassa changed B.A.'s medication after the back-to-back seizures, Yassa ordered an EEG without also ordering additional laboratory testing. This undermines her claim that the purpose of the repeat EEG was to assess the efficacy of the changes in medicine.

There is substantial evidence to support the finding that there was no medical indication for the repeat EEG's.

C.      *Indication for BAER test*

Yassa challenges the sufficiency of the evidence to support the finding that she was grossly negligent in ordering a BAER test without medical indication. She argues, contrary to the finding in the Decision, that she did not order the BAER to test for hearing loss, but to rule out concerns that a brain tumor might be affecting B.A.'s balance. We agree.

15

Although the BAER report listed B.A.'s history as "hearing loss, dizziness," Yassa's medical records show that after B.A. complained about "dizzy spells" and frequent tripping, Yassa ordered the BAER test "to rule out any brain stem lesions." This is an appropriate use for a BAER test. The finding in the Decision that Yassa did not document "any concern about a brain lesion in B.A.'s medical record" is contrary to the evidence. Thus, we conclude the finding that Yassa engaged in gross negligence by ordering the test is not supported by substantial evidence.

D.     *Adverse effects of Lamictal*

Yassa challenges the finding that she was grossly negligent because she lacked knowledge of, or failed to consider, the adverse effects of adding Lamictal to B.A.'s existing medications. She construes the Decision as criticizing her for attempting to transition B.A. from Depakote to Lamictal because B.A. was of childbearing age, and argues that unrefuted evidence establishes her attempt to transition B.A. to Lamictal was within the standard of care.

Yassa mischaracterizes the Decision. At the hearing, Florin criticized Yassa for adding Lamictal, rather than simply increasing her existing prescription for Depakote back to previous levels (1,500 milligrams per day). However, the Decision did not rely on that criticism as a basis for discipline. The Decision found cause for discipline based on Yassa's failure to monitor and recognize the adverse effects of adding Lamictal to B.A.'s existing prescription for Depakote. That finding is supported by substantial evidence, which includes Florin's testimony and Yassa's medical records showing that Yassa failed to order any testing to monitor the effects of adding Lamictal on B.A.'s Depakote levels and failed to recognize when B.A. suffered an adverse reaction to the Lamictal.

E.     *Prescription for Prozac*

Yassa argues there is insufficient evidence to support the finding that she committed gross negligence by prescribing Prozac to B.A. despite a history of suicidal

thoughts. We agree. Even complainant's expert opined that it is within the standard of care for a physician to prescribe Prozac to a patient with a history of suicidal thoughts provided the physician obtains information about the severity of the patient's suicidal thoughts and discusses the risks with the patient.

The evidence in the record shows that B.A. presented to Yassa with a history of depression and suicidal thoughts. Yassa testified that B.A. continued to exhibit signs of depression, but not suicidal thoughts. Yassa testified that she discussed B.A.'s history of suicidal thoughts with B.A.'s mother, who told Yassa it was no longer an issue. There is no evidence to the contrary.

Florin testified that it would have been an extreme departure from the standard of care for Yassa to prescribe Prozac without discussing the risks of Prozac, but Yassa testified that it was her custom and practice to have such a discussion, and she argues there is no evidence that she deviated from that custom and practice in this case. Yassa is correct.

The Decision faults Yassa for failing to document a discussion about the risks of Prozac. But there is no evidence that Yassa committed gross negligence merely by failing to document a discussion. The finding that Yassa committed gross negligence by prescribing Prozac is not supported by substantial evidence.

F. *Diagnosis of circadian sleep disorder*

Yassa also challenges the sufficiency of the evidence for the finding that she engaged in gross negligence by improperly diagnosing circadian sleep disorder without documenting the evidence to support her diagnosis. We agree that there is no basis for finding this was an *extreme* departure from the standard of care. Both experts agreed that diagnosing circadian sleep disorder without documenting the basis for the diagnosis was only a *simple* departure from the standard of care. To the extent the Decision relied on the circadian sleep disorder diagnosis to support finding an extreme departure from the standard of care, the finding is not supported by substantial evidence.

17

V

*Patient R.C.*

The Decision found that Yassa was grossly negligent in her care and treatment of patient R.C. because she (1) ordered electromyogram and nerve conduction velocity (EMG/NCV) tests; (2) ordered EEG's without medical indication; (3) lacked knowledge in how to read an EEG and improperly diagnosed R.C. with epileptic seizures based on her misreading of the EEG; (4) lacked knowledge of or failed to consider the drug interactions between Depakote and R.C.'s other medications; (5) improperly diagnosed R.C. with MS; and (6) lacked knowledge of how to recognize the symptoms of Lhermitte's Syndrome. Yassa contends there is insufficient evidence to support these findings. We conclude that there is not substantial evidence to support the findings relating to the ordering of the EMG/NCV's, the drug interactions, and the failure to recognize the symptoms of Lhermitte's Syndrome, but that the other findings are supported by substantial evidence.

A.     *Additional background*

Patient R.C. was a 56-year-old woman with a history of back surgery for a herniated disc. In November 2012, R.C. presented to her primary care physician with complaints of neck pain and occasional tingling and numbness in her upper extremities. Her physician ordered an X-ray and an MRI of the cervical spine. The X-ray showed moderate degenerative changes. The MRI indicated abnormalities in the upper cervical cord, which suggested the possibility of a demyelinating disease.[10] R.C. was referred to Yassa for a neurologic evaluation.

---

[10]     The most common demyelinating disease in this context is MS.

18

Yassa first saw R.C. on December 10, 2012. R.C. presented with complaints of neck pain, back pain, headaches, difficulty concentrating, fatigue, and dizzy spells. R.C. denied taking any medication.

Yassa documented that R.C.'s neck was " 'killing her,' " and that R.C. had numbness in her neck, arms, and right knee; generalized weakness on the left side; that she at times feels "dead" from the hips down; and that she had "[s]tarted losing her urine." Yassa also noted that R.C. had dizzy spells, was unable to concentrate, had no energy to work, and felt "she may have a stroke." At the hearing, R.C. testified that her current complaint at the time was neck pain, and that any discussion of numbness, "dead hips," or dizzy spells was related to her past medical history. R.C. denied telling Yassa that she was starting to lose her urine or feeling that she was about to have a stroke.

Yassa conducted a neurological examination of R.C., which was normal. Yassa's assessments were: rule out demyelinating disease of central nervous system; paresthesia of face and/or extremity; vertigo; and memory loss. Yassa ordered several tests, including an MRI of the brain, two EEG's (one video and one ambulatory), and two EMG/NCV tests.

The results of the video EEG and the EMG/NCV tests were normal. Yassa concluded the results of the ambulatory EEG were "abnormal" and "highly suggestive of a generalized seizure[] disorder."

On December 28, 2012, R.C. had an MRI of her brain. The radiological report included a comparison to a prior MRI performed in 2007. The report noted approximately 20 nonspecific "FLAIR hyperintensities," "slightly more numerous" than the 2007 MRI. The report also noted there may be a small lesion involving the anterior portion of the corpus callosum, which "raises the possibility of a demyelinating process such as [MS]," among other possibilities.

Yassa testified that she also spoke with Dr. Peter Knudsen (Knudsen), a neuroradiologist, about the 2007 MRI results. According to Yassa's handwritten note

19

dated February 26, 2013, Knudsen told her the 2007 MRI showed "[more than] 15 lesions Supra & infratentorial [consistent with] MS." Yassa testified that the 2012 MRI, together with the 2007 MRI, confirmed that R.C. had MS.

At R.C.'s second appointment on February 26, 2013, Yassa's assessment of R.C. was "demyelinating disease, rule out," "parasthesia of face and[/]or extremity," "vertigo," and "memory loss." Yassa prescribed Depakote, 1,000 milligrams per day. Yassa told Board investigators that she prescribed the Depakote based on the results of the EEG and R.C.'s complaints of numbness and tingling.

On March 12, 2013, R.C. went to the emergency room with symptoms of nausea, vomiting, and slurred speech. R.C.'s Depakote level was measured to be too high.

On March 13, 2013, R.C. had a spinal tap (lumbar puncture). The following day, R.C. saw Yassa and reported that she was feeling sick. Yassa documented that R.C. was feeling sharp pain from her head to her feet. At the hearing, R.C. denied making this complaint. Yassa diagnosed R.C. with Depakote toxicity and discontinued Depakote.

At the next (and final) appointment, Yassa documented that R.C.'s spinal tap results were abnormal. However, during her Board interview, Yassa admitted that the results were normal, and that she had misread them.

R.C. filed a written complaint against Yassa in April 2013. Yassa responded to the complaint in a letter to the Board dated August 5, 2013. Among other things, Yassa's letter stated that R.C. met the McDonald criteria for diagnosis of MS; that lesions on R.C.'s brain explain her symptoms of fatigue, numbness, and urinary incontinence; that the ambulatory EEG showed "muscle tension"; and that R.C. incorrectly assumed high Depakote levels caused the sickness that prompted her to visit the emergency room.

20

B. *Ordering the EMG/NCV's*

Yassa challenges the sufficiency of the evidence to support the finding that she was grossly negligent because she ordered the EMG/NCV's without medical indication.[11] We agree the finding is not supported by substantial evidence.

The finding is based on the testimony of Florin, who concluded that there was no indication for the EMG/NCV's because all of R.C.'s symptoms could be explained by her partial transverse cervical myelopathy or by her arthritis and disc problems in the cervical spine. However, both experts agreed that physicians should exercise great caution before making a diagnosis of MS. And while MS is the most common cause of partial transverse cervical myelopathy, Florin admitted it is not the only cause.

Cassini testified that before diagnosing a patient with MS, the standard of care requires ruling out other conditions that might cause similar symptoms. Thus, Cassini opined, the EMG/NCV's were medically indicated to check for other potential sources of R.C.'s symptoms, including numbness and tingling in her hands and leg.[12] And R.C.'s testimony supported his opinion. R.C. testified that after leaving Yassa's care, her subsequent treating neurologists ordered nerve conduction studies due to her ongoing complaints of numbness and tingling.

Florin was unaware of what tests were ordered by R.C.'s subsequent treating neurologists and he never explained why it was an *extreme* departure from the standard of care to order EMG/NCV's to check for other potential sources of R.C.'s symptoms of

---

[11] Yassa also challenges the finding that the EMG/NCV's tested all the muscles of the upper extremities. Because Yassa has failed to explain how the finding is consequential to the Decision, we decline to consider her contention.

[12] To the extent the Decision found there were no complaints of numbness, that finding is not supported by substantial evidence.

21

numbness/tingling.  Thus, we conclude substantial evidence does not support the finding that Yassa committed gross negligence by ordering the EMG/NCV's.

C.    *Ordering and misreading the EEG's*

Yassa challenges the findings that she committed gross negligence by ordering EEG's without medical indication, incorrectly interpreting the EEG results, and then prescribing medication based on her misreading of the ambulatory EEG.[13]

We conclude there is substantial evidence in the record to support the finding that Yassa ordered EEG's without medical indication.  Florin testified that based on R.C.'s prior medical history and reported symptoms, there was no medical indication for the EEG's because R.C. never had any symptoms of a seizure.

Yassa suggests the EEG's were warranted in light of R.C.'s other reported symptoms, including incontinence, dizziness, and feeling like she may have a stroke.  But the Decision credited R.C.'s testimony that she never actually complained about incontinence, dizzy spells, memory loss, or feeling that she may have a stroke.  R.C.'s testimony, combined with Florin's expert opinion, is substantial evidence to support the finding that Yassa committed gross negligence by ordering the EEG's without medical indication.

There also was substantial evidence to support the finding that Yassa lacked the knowledge to read R.C.'s EEG results and treated R.C. for seizures based on a misreading of the EEG results.  The evidence shows that Yassa interpreted the ambulatory EEG results as "abnormal" and "highly suggestive" of a generalized seizure disorder.  Yassa told R.C. that the EEG showed she had a seizure around 6:00 on the

---

[13]    Yassa also claims the Decision erroneously found that she diagnosed R.C. with epilepsy.  Yassa is technically correct, but she misconstrues the import of the finding, which is that Yassa misread the EEG as showing "epileptiform discharges" and prescribed Depakote for seizures based on the EEG results.

22

morning of February 6. Yassa told investigators that she prescribed Depakote based, in part, on the EEG results.

However, R.C.'s "Patient Event Diary" showed that R.C. accidently stood in front of a working microwave while wearing the EEG equipment at around the same time as the alleged seizure. When Board investigators confronted Yassa about this, Yassa admitted she did not know the significance of standing in front of a microwave for EEG results.

Subsequently, at the hearing, Yassa contradicted herself and testified that she was aware of the effects of microwaves on EEG's and took the microwave into account when interpreting R.C.'s EEG results. She contradicted her own medical records by testifying that the results of the EEG were "normal."[14]

There is substantial evidence to support a finding that Yassa lacked the knowledge to read R.C.'s EEG results, misread R.C.'s EEG results, and prescribed medication based (as least in part) on her misreading of the EEG results.

D.     *Failure to consider other medications*

Yassa challenges the finding that she was grossly negligent by prescribing Depakote without considering how it might interact with the other medications R.C. had been prescribed by her primary care physician. Yassa argues that the finding was based on an erroneous assumption that R.C. was taking other medications, when the record shows that R.C. had discontinued all other medications by the time of her first appointment with Yassa. We agree.

Florin's opinion that Yassa committed an extreme departure from the standard of care was based on his assumption that, at the time Yassa prescribed Depakote, R.C. also

---

[14]     At the hearing, Yassa also contradicted her statement at the Board interview when she testified that she prescribed Depakote not because of the EEG results, but solely because of R.C.'s paroxysmal events.

was taking a number of other medications, including Lyrica, Flexeril, Mobic, and Nexium. However, the evidence in the record shows that every medication prescribed to R.C. by her primary care physician had been discontinued by the time of R.C.'s first appointment with Yassa on December 10, 2012. Thus, there is no substantial evidence to support the finding that Yassa committed an extreme departure from the standard of care by failing to consider the interaction "between Depakote and other medications R.C. had been prescribed by her [primary care physician]."[15]

E.      *Misdiagnosis of MS*

Yassa challenges the finding that she committed gross negligence by misdiagnosing R.C. with MS. Yassa contends the medical records show that she only considered MS as a differential diagnosis and never made a definitive diagnosis of MS. Yassa's argument lacks merit. Although her medical records consistently stated an assessment of "demyelinating disease, rule out," there is substantial evidence in the record that Yassa diagnosed R.C. with MS, including Yassa's letter to the Board, R.C.'s testimony and written complaint, and Yassa's own testimony at the hearing. Indeed, Yassa seemingly contradicts herself in her brief by arguing that R.C. met the McDonald criteria for diagnosing MS.[16]

F.      *Failure to recognize Lhermitte's Syndrome*

Yassa challenges the finding of gross negligence based on Yassa's "demonstrated lack of knowledge" in failing to recognize complaints of "sharp pain from head to feet" as Lhermitte's Syndrome. Yassa contends this finding is not supported by the evidence

---

[15]     In its respondent's brief, the Board notes that Yassa's own expert testified the standard of care required Yassa to obtain a baseline laboratory test when she prescribed the Depakote. However, Cassini testified that a baseline laboratory test was ordered, and that Yassa complied with the standard of care.

[16]     To the extent Yassa is attempting to argue that she correctly diagnosed R.C. with MS, there is substantial evidence to support a contrary finding.

because the evidence shows that R.C.'s complaints of pain clearly were related to R.C.'s spinal tap.

The Board does not address this finding in its opposition brief, and we have not identified any evidence in the record to support the Board's finding. We could not find any evidence showing that Yassa's failure to identify the reported pain as Lhermitte's Syndrome constituted an extreme departure from the standard of care. Under the circumstances, substantial evidence does not support finding that Yassa committed an extreme departure from the standard of care by failing to recognize symptoms of Lhermitte's Syndrome.

G.    *Misreporting of spinal tap results*

Yassa argues there is insufficient evidence to support the finding of gross negligence based on her misreporting the spinal tap results as abnormal. However, Yassa has failed to show that the Decision found such conduct to be an extreme departure from the standard of care. Accordingly, we need not decide whether the finding is supported by substantial evidence.

VI

*Patient D.K.*

The Decision found that Yassa committed repeated negligent acts by (1) failing to keep accurate and adequate records regarding her diagnosis that D.K. had a "tremor"; (2) billing for a level of services that was not substantiated by the treatment records; and (3) lacking knowledge of and failing to use the controlled substance utilization review and evaluation system (CURES) despite a concern that D.K. was drug seeking. The Decision also found that Yassa is subject to civil penalties under sections 2225, subdivision (e), and 2225.5 for failing to timely provide a certified copy of D.K.'s medical records to the Board. Yassa contends insufficient evidence supports these findings. We conclude there is not substantial evidence to support negligence based on her failure to use CURES, but affirm the other findings.

25

A.  *Additional background*

Patient D.K. was a 51-year-old male who suffered from obesity and was confined to a wheelchair as a result of a failed back surgery in or about 1997.  His medical history was more than 500 pages, and included complaints of chronic pain in his neck, back, and knee, arthritis, fatigue, depression, and tremors, among other problems.  For many years after his failed back surgery, D.K. was prescribed opioids to manage his chronic pain.  However, in 2013 D.K.'s pain medication was changed to tramadol, which at the time was not a scheduled controlled substance.  In February 2014, D.K. was referred to Yassa by his primary care physician due to complaints of peripheral neuropathy, which manifested as tingling and burning pain in his hands and feet.  The referral included a request for an EMG.

D.K. met with Yassa only once, on March 27, 2014.  During the visit, Yassa documented D.K.'s symptoms and performed a neurological examination, which, aside from finding "minimal cog wheel rigidity," was normal.  Yassa assessed D.K. with neuropathic pain, restless leg syndrome, obesity, carpal tunnel syndrome, low back pain, and tremor.

During the visit, Yassa recommended that D.K. stop taking tramadol.  At her Board interview, Yassa explained to investigators that she recommended D.K. stop taking tramadol because it can cause seizures.

Yassa billed the visit as a level five, the highest level of complexity, requiring extensive counseling of the patient.  Yassa documented the visit as lasting more than 40 minutes.  Her medical records showed that the appointment started at approximately 9:15 a.m. and that she "closed" the encounter at 11:11 a.m.  D.K. testified that although he was at Yassa's office for a "[f]ew hours," he spent most of that time in the examination room waiting for Yassa.  He testified his visit with Yassa lasted "15 minutes or less."

On March 28, 2014, D.K. filed a complaint against Yassa with the Board.  He claimed that he and his mother were forced to wait for Yassa in the exam room for

26

approximately one hour and 45 minutes.  He claimed that when Yassa finally entered the exam room, she was rude, unprofessional, and unwilling to let him speak.  He also complained that Yassa told him his back issues were insignificant and that she would be "removing" him from his pain medication.

By letter dated November 3, 2014, Board investigator Vanderveen requested Yassa provide a certified copy of D.K.'s complete medical records.  Later that month, Yassa's office sent a copy of D.K.'s medical records to the Board.  Subsequently, during Yassa's Board interview, Vanderveen discovered that she had not received a complete copy of D.K.'s medical records.

Through her attorney, Yassa sent additional records in May 2015, and then another "complete certified copy" of D.K.'s medical records in August 2016.  Vanderveen testified that the records provided in August 2016 may still have been incomplete because they appeared to omit patient records faxed to Yassa by the Chapa-De clinic in February 2015.  However, Vanderveen was unable to determine precisely what records were missing and whether Yassa actually received them.

At the hearing, Yassa admitted her office had difficulties with the electronic medical record system, but she denied ever intentionally withholding documents.

B.    *Adequate and accurate records*

Yassa challenges the sufficiency of the evidence to support the finding that she negligently failed to maintain accurate, complete, and timely medical records because she did not sufficiently document the basis for her diagnosis of tremor.[17]  We conclude there is substantial evidence to support the finding.  Yassa listed "tremor" as a diagnosis for

---

**17**    To the extent the Decision also found a violation based on her failure adequately to document her diagnoses of neuropathy and/or chronic inflammatory demyelinating polyneuropathy (CIDP), we agree with Yassa that there was not substantial evidence to support such findings as the evidence shows neuropathy is not a diagnosis and there was no diagnosis of CIDP.

D.K. in her medical records. She did not document any basis for the diagnosis. Thus, as Florin opined, her records do not support the diagnosis.

At the hearing, Yassa claimed that she merely documented "tremor" based on D.K.'s past medical history. But there is nothing in her medical records to indicate that the tremor diagnosis was "by history" or a reference to D.K.'s past medical history. Thus, even if her intent merely was to document D.K.'s past medical history, her records were misleading, inaccurate, and incomplete, which was a simple departure from the standard of care.

C. *Improper coding/billing of services*

Yassa next challenges the sufficiency of the evidence to support the finding that she was negligent in coding/billing her encounter with D.K. as a level five visit, which generally requires extensive counseling of the patient. Yassa argues that the level five coding was warranted based upon the duration of the visit, the magnitude of the patient's medical history, and the complexity of the case. Yassa cites to evidence showing that D.K.'s medical history was over 500 pages, and that D.K.'s visit with Yassa lasted more than 40 minutes, including what Yassa characterizes as "lengthy discussions" about the need for D.K. to taper off tramadol.

However, the evidence on the scope of the visit was conflicting. First, Yassa herself testified that D.K. was referred to her only for an EMG/NCV, that she never was expected to take over D.K.'s care, and that she only reviewed D.K.'s history and medication as an accommodation to the patient. That testimony undermines her claim that she needed to review 500 pages of medical history.

Second, D.K. testified that although he was at Yassa's office for a "[f]ew hours," he spent most of that time in the examination room waiting for Yassa. He testified that while waiting, he and his mother overheard Yassa arguing outside the examination room with other people about money. D.K. testified that when Yassa finally entered the

28

examination room, she was "[a]gitated," with "very rapid speech." He testified that his entire visit with Yassa was "15 minutes or less."

As discussed above, in reviewing the judgment, any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the trial court's decision. (*Arthur v. Department of Motor Vehicles, supra*, 184 Cal.App.4th at p. 1205.) The power of an appellate court begins and ends with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the finding of fact. (*Estate of Wilson* (1980) 111 Cal.App.3d 242, 247.) Because there is substantial evidence to support the finding that Yassa only met with D.K. for about 15 minutes, and did not provide extensive counseling, the finding that Yassa was negligent in coding/billing the encounter as a level five visit is affirmed.

D. *Failure to use CURES system*

Yassa also challenges the sufficiency of the evidence for the finding that she was negligent because she lacked knowledge of and failed to use CURES despite a concern that D.K. was drug seeking. We agree with Yassa that there was not substantial evidence to support the finding. As Yassa argues, the finding that she was required to check CURES was premised on the assumption that she suspected D.K. was drug seeking. But Yassa did not tell investigators that she thought D.K. was drug seeking. Instead, the reference to drug seeking was made by her counsel. It is not clear from the record why her counsel was referring to drug seeking, and Yassa never testified or agreed that she suspected D.K. was drug seeking. Absent such evidence, there is no basis for the finding that Yassa departed from the standard of care by failing to run a CURES report for D.K.

E. *Civil penalties for failure to provide records*

Yassa also challenges the assessment of a $10,000 civil penalty under section 2225.5 based on Yassa's failure to provide a complete certified copy of D.K.'s medical records to the Board within 15 days of receiving the request. We find no abuse of discretion.

29

Section 2225.5, subdivision (a)(1) provides that a "licensee who fails or refuses to comply with a request for the certified medical records of a patient . . . within 15 days of receiving the request and authorization, shall pay to the board a civil penalty of one thousand dollars ($1,000) per day for each day that the documents have not been produced after the 15th day, up to ten thousand dollars ($10,000), unless the licensee is unable to provide the documents within this time period for good cause." (§ 2225.5, subd. (a)(1).) The Decision found that Yassa received a request for D.K.'s records in early November 2014, and never provided a complete copy of his medical records.

Yassa claims that (1) there was no evidence that she received a request for D.K.'s records accompanied by that patient's written authorization for release of records; (2) there was no evidence that the Board did not receive a complete copy of D.K.'s medical records from Yassa; and (3) Yassa had good cause for failing to provide a complete copy of D.K.'s records within 15 days. Yassa's claims lack merit.

The record shows that Yassa received a request for a copy of D.K.'s certified records and written authorization for release of records in early November 2014. However, and despite multiple attempts by the Board to obtain the records, it was not until August 2016 that Yassa finally provided an ostensibly "complete certified copy" of D.K.'s records.

Although Yassa argues that she had good cause for providing late or incomplete records, we are not persuaded that her difficulties with the electronic recordkeeping system compels us to excuse a nearly two-year delay in complying with the Board's request for records. Under the circumstances, it was not an abuse of discretion to impose the maximum statutory penalty of $10,000 for Yassa's violation.

VII

*Conclusion*

We have found insufficient evidence to support the findings that Yassa was (1) grossly negligent in her care and treatment of patient B.A. because she ordered a

BAER test without medical indication, prescribed Prozac despite a history of suicidal thoughts, or improperly diagnosed circadian sleep disorder without documenting the evidence to support her diagnosis; (2) grossly negligent in her care and treatment of patient R.C. because she ordered the EMG/NCV's without medical indication, prescribed Depakote without considering how it might interact with the other medications, or failed to recognize the symptoms of Lhermitte's Syndrome; and (3) was negligent in her care and treatment of patient D.K. because she failed to use the CURES system. Accordingly, a peremptory writ shall issue directing the superior court to set aside those portions of its decision. In all other respects, the petition is denied.

## DISPOSITION

Yassa's appeal, treated as a petition for extraordinary relief, is granted in part. Let a peremptory writ of mandate issue directing the superior court to vacate its judgment denying a peremptory writ of mandate and enter, in its place, a judgment partially granting a peremptory writ of mandate, consistent with this opinion. The parties shall bear their own costs in this proceeding. (Cal. Rules of Court, rule 8.278(a)(3).)


          KRAUSE         , J.


We concur:


     RAYE          , P. J.


     BLEASE       , J.


31